### BENNETT *v.* HUNTER.

1. The act of 5th August, 1861, "To provide increased revenue from imports, to pay interest on the public debt, and for other purposes;" and the act of June 7th, 1862, "for the collection of direct taxes, in insurrectionary districts, within the United States, and for other purposes," are to be construed together; and so construed, their primary object is to be regarded as having been the raising of revenue.
2. Thus construed, the first clause of the 4th section of the act of 1862—which clause enacts "that the title of, in, and to each and every piece and parcel of land upon which said tax has not been paid as above provided, shall thereupon become forfeited to the United States,"—does not operate *proprio vigore*, to vest the title of the land in the United States upon non-payment of the tax; that clause being followed immediately by another which says, "and upon *the sale hereinafter provided for* shall vest in the United States, or in the purchasers at such sale, in fee simple, free and discharged from all prior liens, incumbrances, right, title, and claim whatsoever." The first clause merely declares the ground of the forfeiture of title, namely, non-payment of taxes, while the second clause was intended to work the actual investment of the title in the United States or in the purchaser at the tax sale, through a public act of the government.
3. Under the act of 1862, the right to pay the tax and relieve the land from sale, is not limited to sixty days after the fixing of the amount of it by the proper authorities. Payment prior to sale is sufficient.
4. Payment of the tax, which the act requires to be made by the owner, need not necessarily be made by the owner in person. It is enough that it be made by him acting through some friend or agent, compensated or uncompensated; any person, in short, willing to act in his behalf, and whose act is not disavowed by him.

ERROR to the Supreme Court of Appeals of Virginia; the case being thus:

* Jackson *v.* Bard, 4 Johnson, 230; Heath *v.* Ross, 12 Ib 140.

By an act of August 5th, 1861,* passed in quite the early part of the late rebellion, Congress having laid a duty on incomes, imposed a direct tax of $20,000,000 per annum upon the whole of the United States, of which a certain sum was apportioned to Virginia. The act provided that the tax should be assessed and laid on all lands according to their money value on the 1st of April, 1862; and it provided for the assessment and collection of the tax, and authorized the sale of so much of the lands of delinquent payers as might be necessary to satisfy the taxes due thereon; and furthermore provided that at any time after the advertisement for sale and before actual sale, the delinquent taxpayer might pay the amount assessed with ten per cent. penalty, and thus relieve his lands; and yet further that, in the event of a sale of property for non-payment of the tax assessed thereon, the owners, their heirs, executors, administrators, *or any person in their behalf*, might redeem the same within a certain period thereafter. The act also provided that if, at the time it went into operation, any of the people of any State should be in actual rebellion, so that the laws of the United States could not be executed therein, it should be the duty of the President to collect both land tax and income tax, with six per cent. *interest*, according to the provisions of the act, as soon as the authority of the government should be re-established.

Afterwards, however, the rebellion having now become widespread, and assumed far greater magnitude, an act of June 7th, 1862,† declared that when in any State the civil authority of the government of the United States should be obstructed by insurrection or rebellion, so that the provisions of the former statute could not be peaceably executed, the direct taxes apportioned by that statute should be apportioned and charged in each State wherein the civil authority was thus obstructed, upon all the lands situate therein, respectively, &c., as the same were enumerated and valued under the last assessment and valuation thereof made under

---

* 12 Stat. at Large, 294.                    † Ib. 422.

the authority of said State or territory previous to January 1st, 1861; and every parcel of the said lands, according to the said valuation, was declared to be charged, by virtue of the act itself, with the payment of so much of the whole tax laid and apportioned by said act upon the State wherein the same was situate, as should bear the same direct proportion to the whole amount of the direct tax apportioned to said State as the value of said parcels of land should, respectively, bear to the whole valuation of the real estate in the said State, according to the said assessment and valuation made under the authority of the same, and in addition thereto with a penalty of fifty per centum of said tax.

The 3d section allowed the *owner or owners* of the lands, *within sixty days* after the amount of the tax charged thereon, respectively, should have been fixed by a board of tax commissioners (the appointment of which was provided for by the act), to pay the same to the commissioners, and take a certificate thereof, by virtue of which the lands should be discharged from the tax.

The 4th section (which, if we divide the enactment into two clauses, reads thus) enacted as follows:

*1st clause.* "That the title of, in, and to each and every piece or parcel of land upon which said tax has not been paid as above provided, shall *thereupon* become forfeited to the United States.

*2d clause.* "And upon the sale hereinafter provided for, shall vest in the United States or in the purchasers at such sale, in fee simple, free and discharged from all prior liens, incumbrances, right, title, and claim whatsoever."

The 7th section, as amended by the act of February 6th, 1863,* required the board of tax commissioners in case the taxes charged on the lands should *not be paid agreeably to the provisions of the 3d section,* to advertise the property for sale, and to sell the same to the highest bidder, for a sum not less than the taxes, penalty, and costs, and ten per cent. per annum interest on the tax. And it also authorized the com-

---

* 12 Stat. at Large, 640.

missioners, in all cases where the owner of the property should not, on or before the day of sale, appear *in person* before them and pay the amount of the tax, with ten per cent. interest thereon and cost of advertising, or request the property to be struck off to a purchaser for a less sum than two-thirds of the assessed value thereof, to bid off the same for the United States, at a sum not exceeding two-thirds of its assessed value, unless some person should bid a larger sum, and in that case it declared that the property should be struck off to the highest bidder, who, upon payment of the purchase-money, should be entitled to receive from the commissioners their certificate of sale, which was thereby required to be received as *primâ facie* evidence of the regularity and validity of the sale, and of the title of the purchaser under the same, in all courts and places; with a proviso that the *certificate should only be affected as evidence of the regularity and validity of the sale,* by establishing the fact that the property was not subject to taxes, or that the taxes had been paid *previous to sale,* or that the property had been redeemed according to the provisions of the act. Also, by a proviso to this section, the owner of the property, or any loyal person having any valid lien upon or interest in the same, might, within sixty days after the sale, *appear in person* before the board of tax commissioners, and, if a citizen, upon taking an oath to support the Constitution, and paying the amount of the tax and penalty, with interest thereon, from the date when the State went into rebellion, at the rate of fifteen per cent., together with the expenses of the sale and subsequent proceedings, &c., redeem the same; and, if the owner were a minor, a non-resident alien, a loyal citizen beyond seas, a person of unsound mind, or under legal disability, the period of two years after the sale was allowed for redemption.

Under this act of the 7th of June, 1862—the second of the acts above mentioned—a tax was assessed upon a tract of land situate in Alexandria County, Virginia, of which one B. W. Hunter was then owner for life, the property in remainder being in his son, and default having been made in payment, the land was advertised for sale. After advertise-

ment, but before sale, the amount of the tax, expenses, penalties, and costs (the whole being within $100), was tendered *by a tenant, in occupation of about half of the premises,* to the commissioners appointed for the collection of taxes under the act, who refused to receive the money, upon the ground that the tender was not made by the owner of the land in person. The land was then, January 11th, 1864, sold, and one Chittenden became the purchaser, and received a certificate from the commissioners, reciting the sale and his purchase for $8000. He thereupon leased the property to one Bennett, who went into possession. After the close of the war, Hunter, the son, who had served as an officer in the rebel army, but against whose property no proceedings for confiscation had been instituted, and whose estate in remainder had now become absolute, brought suit in one of the State courts of Virginia to recover possession of the land. No question was made of his right to recover if his title was not divested by the sale for taxes. The court in which the suit was brought gave judgment in his favor, and the judgment being affirmed by the Supreme Court of Appeals of the commonwealth, the other side brought the case here for review.

The case, as this court considered it, required the consideration and determination of one point only, namely, whether the commissioners under the act could make a valid sale for taxes, notwithstanding the previous tender *by the tenant of half the premises,* of the amount due? Other important and interesting questions were argued at the bar, but under the view taken of the case by this court they need not be stated.

*Messrs. Chittenden and Willoughby (Mr. Hoar, Attorney-General, and Mr. Field, Assistant Attorney-General, filing a brief by leave of the court, for the United States), for the plaintiff in error:*

1. Congress, having power to "lay and collect" taxes, and "to make all laws which shall be necessary and proper for carrying into execution" that power, may, for the purpose of enforcing their collection, declare a forfeiture of land for the non-payment of taxes laid thereon, or authorize a

sale, by summary proceedings on the part of the executive branch of the government, of the whole of such land. Such summary measure is not in conflict with that clause of the Constitution which declares that no person shall be deprived of property without " due process of law."*

That clause refers solely to the exercise by the State of the right of eminent domain.†

2. The 4th section of the act of 1862 created a forfeiture to the United States of land upon which the direct tax had not been paid as provided in the 3d section of that act, which took effect at the time of default and prior to the sale or disposition of the property as provided for in the 7th and other following sections of the act.

This appears from the plain import of the language employed in declaring the forfeiture. The latter clause of the section does not qualify the preceding clause respecting the time when the forfeiture becomes absolute. The section has two branches—the first making the forfeiture of title, and the second the ultimate vesting of that title. To declare *the title*, in the particular event, to be forfeited to the United States, clearly means that *the title* is divested out of the defaulting owner, and devolved upon the United States. The section does not say that the delinquent lands shall be forfeited; but that *the title* of the owner of them shall be lost to him, and forfeited to the United States. But how, and for what purpose forfeited? The law itself gives the reply: not to be held by the United States for its own use, but to be sold for payment of taxes, penalty, and costs; and that sale, under the scheme of the law, becomes the appointed mode in which *the title* ultimately *vests*. Now, the condition of this sale is to the highest bidder; but in case no one bids to the amount of the penalty and costs, then it may be struck off to the United States at that sum. By the act of 1862, as subsequently amended by the act of 1863, the privilege of bidding by the commissioners, for and on behalf of the

---

* High v. Shoemaker, 22 California, 363; Nichols v. Bridgeport, 23 Connecticut, 205; Allen v. Armstrong, 16 Iowa, 512.

† Gilman v. Sheboygan, 2 Black, 513.

United States, was enlarged to the extent of two-thirds of the assessed value. In this way, the law appointed and designated two classes of purchasers at the sale—first, the highest bidders, and, secondly, the United States, acting through the commissioners, and subject to the restrictions of these acts. The United States, as well as the highest bidders, might be purchasers at these tax sales. When, therefore, the latter clause of this 4th section declares, that "the title, upon the sale hereinafter provided for, shall vest in the United States or the purchasers at such sale," it has exclusive reference to the United States as *a purchaser*, and not as *the sovereign*, to whom the forfeiture had been declared in the preceding clause.

After default, therefore, there was nothing left in the owner but *a mere privilege of redemption*, capable of being exercised only in such mode and upon such terms as the law prescribed.

3. It does not appear that the tax was paid within the sixty days. The case shows, that after the advertisement of the sale of said premises referred to in said certificate, and before sale, a tender by some one was made. But unless made within the sixty days, it was no tender even if it had been made by the owner in person. But

4. The *owner* did not make the tender, as the law required. The case shows that the tender was made by *a tenant in occupation of about one-half of said premises.* We concede that a *lawful* tender of the tax to the officer authorized to receive it would have been tantamount to payment, but deny that the tender in this case was lawful.

*Messrs. J. A. Garfield and S. F. Beach, contra,* citing, on the point of the tenant's tender, the case of *Dubois* v. *Hepburn** in this court, in which, on a case of redemption after sale, and, as they argued, a stronger case, therefore, than this, since interests had vested by the sale, the court say:

"Any person who has any interest in the land . . . is the

---

* 10 Peters, 1.

owner thereof for the purpose of redemption. Any right of entry upon it, to its possession or enjoyment or any part of it, which can be deemed an estate in it, makes the person the owner for purpose of redemption."

The CHIEF JUSTICE delivered the opinion of the court.

The case requires the consideration and determination of one point only, namely, whether the commissioners under the act could make a sale for taxes, notwithstanding a previous tender of the amount due?

In order to a right understanding of the real point in controversy, however, it will be useful to notice briefly the occasion and the objects of the enactments which have given rise to it.

The necessities of the war, arising from the rebellion, demanded immediate provision of adequate funds. For this purpose Congress increased the duties on customs, imposed a duty on incomes, and laid a direct tax of twenty millions of dollars upon lands. This latter tax was apportioned, agreeably to the direction of the Constitution, among the several States in proportion to their respective numbers; and it was provided that, if the act could not be carried into execution in any State in consequence of rebellion, it should be the duty of the President to proceed, as soon as the authority of the United States should be re-established therein, to collect both the land tax and the income tax, with six per cent. interest.

The income tax thus imposed has never been collected; but provision was made by the act of June 7th, 1862, for the collection of the land tax in the insurgent States. This act, or some similar provision, was necessary to enable the President to perform the duty devolved upon him by the act of 1861. The acts of 1861 and 1862 are, therefore, to be construed together. The general object of both was the same, namely, the raising of revenue by a tax on land. The first prescribed a mode of collection where the authority of the General Government was acknowledged, and no serious obstacle existed to the execution of the law; the second di-

rected the mode of collection where this authority had been overthrown by insurrection, but had been sufficiently re-established to make collection, to some extent at least, practicable.

The provisions of the latter act were necessarily adapted to the peculiar circumstances in which it was to be executed, and were in most respects more stringent than those of the former. The first act, for example, directed the assessment of lands by assessors to be appointed under it; the second adopted the valuation made under the authority of the several States prior to the rebellion, and charged directly upon each parcel of land its proportion of the tax apportioned to the State. Under the first act, delinquent tax-payers were permitted, at any time after advertisement for sale, and before actual sale, to pay the amount assessed with ten per cent. penalty, and thus relieve their lands. The second act imposed on each tract, without respect to delinquency on the part of the owner, a penalty of fifty per cent. in addition to its proportion of the tax upon the State, and, it is contended, allowed payment only within sixty days after assessment. In the earlier act indulgent provision was made for redemption after sale; in the latter, onerous conditions were imposed on such redemption.

Without adverting further to particular points of difference between the two acts, it may be observed that their most striking contrast was in their practical application.

The several adhering States, under the act of 1861, assumed and paid their respective quotas, and collected the amount of the tax from their own citizens under their own laws, so that in those States the machinery of the law was never really put in action; while in the insurgent States the act of 1862, so far as it was executed at all, was carried into effect according to its terms by the officials of the National government. In this way, the citizens of the adhering States were relieved from the processes of collection and from penalties and forfeitures for non-payment, while the citizens of the insurgent States who could not be thus relieved were exposed to their unmitigated operation.

Keeping these circumstances in view, we are to consider the effect of the sale for taxes made, as we have already stated, to the lessor of the plaintiff. And this must depend mainly on the construction to be given to the fourth section of the act of 1862.

This section provides " that the title of, in, and to each and every piece and parcel of land upon which said tax has not been paid as above provided, shall thereupon become forfeited to the United States; and upon the sale hereinafter provided for shall vest in the United States, or in the purchasers at such sale, in fee simple, free and discharged from all prior liens, incumbrances, right, title, and claim whatsoever."

And we are first to consider whether the first clause of this section, *proprio vigore*, worked a transfer to the United States of the land declared to be forfeited.

The counsel for the plaintiff in error have insisted earnestly that such was its effect. But it must be remembered that the primary object of the act was, undoubtedly, revenue, to be raised by collection of taxes assessed upon lands. It is true that a different purpose appears to have dictated the provisions relating to redemption after sale, and to the disposition of the lands purchased by the government; a policy which had reference to the suppression of rebellion rather than to revenue. But this purpose did not affect the operation of the act before sale, for until sale actually made there could be, properly, no redemption. The assessment of the tax merely created a lien on the land, which might be discharged by the payment of the debt. And it seems unreasonable to give to the act, considered as a revenue measure, a construction which would defeat the right of the owner to pay the amount assessed and relieve his lands from the lien. The first clause of the act, therefore, is not to be considered as working an actual transfer of the land to the United States, if a more liberal construction can be given to it consistently with its terms.

Now the general principles of the law of forfeiture seem to be inconsistent with such a transfer. Without pausing to

inquire whether, in any case, the title of a citizen to his land can be divested by forfeiture and vested absolutely in the United States, without any inquisition of record or some public transaction equivalent to office found, it is certainly proper to assume that an act of sovereignty so highly penal is not to be inferred from language capable of any milder construction.* In the case of lands forfeited by alienage the king could not acquire an interest in the lands except by inquest of office.† And so of other instances where the title of the sovereign was derived from forfeiture. And in the case of *United States* v. *Repentigny*,‡ where the forfeiture to the government of lands arose from omission to perform the conditions of the grant, this court held that before the forfeiture could be consummated by reunion of the land with the public domain, " a judicial inquiry should be instituted, or, in the technical language of the common law, office found, or its legal equivalent," should take place. The court said further that " a legislative act directing the possession and appropriation of the land is equivalent to office found."

Applying these principles to the case in hand, it seems quite clear that the first clause of the fourth section was not intended by Congress to have the effect attributed to it, independently of the second clause. It does not direct the possession and appropriation of the land. It was designed rather, as we think, to declare the ground of the forfeiture of title, namely, non-payment of taxes, while the second clause was intended to work the actual investment of the title through a public act of the government in the United States, or in the purchaser at the tax sale. The sale was the public act, which is the equivalent of office found. What preceded the sale was merely preliminary, and, independently of the sale, worked no divestiture of title. The title, indeed, was forfeited by non-payment of the tax; in other words, it became subject to be vested in the United States, and, upon public sale, became actually vested in the United States or in any other purchaser; but not before such public

* Fairfax's Devisee v. Hunter's Lessee, 7 Cranch, 625
† 3 Blackstone's Commentaries, 258.       ‡ 5 Wallace, 265.

sale. It follows that in the case before us the title remained in the tenant for life with remainder to the defendant in error, at least until sale; though forfeited, in the sense just stated, to the United States.

But it has been insisted that the right to pay the tax and relieve the land from sale expired at the end of sixty days after the amount was fixed by the proper authority.

It does not appear when the amount was fixed, or when the sixty days ended. It may be inferred, perhaps, from the fact of sale, that default for payment had continued at least through that time, for otherwise there could have been no power to sell.

If this inference be admitted, however, it by no means follows that the right to pay the tax and have the land discharged from it expired with the sixty days. It is more reasonable to suppose that this right remained as long as the title of the land remained in the owner—that is, until after sale. And this view is confirmed by reference to another part of the act. The seventh section gives direction as to sales, the issue of certificates of sale to purchasers, and proceedings for redemption after sale, and then provides that " the certificate of sale shall only be affected, as evidence of the regularity and validity of sale, by establishing the fact that the property was not subject to taxes, or that the taxes had been paid previous to the sale, or that the property had been redeemed according to the provisions of this act." This provision makes it clear that proof of payment of taxes prior to the sale invalidates the certificate, and this could not be unless the right to pay the tax continued until the sale. This seems to leave no doubt on the point that the right to make such payment was not strictly limited to sixty days after the fixing of the amount of the tax.

But to whom did the right to make this payment belong? The obvious answer is, to the owner, either acting in person or through some friend or agent, compensated or uncompensated. The terms of the act are, that the owner or owners may pay; and it is familiar law that acts done by

one in behalf of another are valid if ratified either expressly or by implication, and that such ratification will be presumed in furtherance of justice.

But it is insisted that the right of payment is limited by the act to the actual owner in his proper person. But we perceive no such limitation in its terms. On the contrary, the fact that the privilege of redemption after sale is limited to the owner or the loyal person having a lien or other interest, appearing in proper person and taking a prescribed oath, appears to us to afford an irresistible inference that the right of payment before sale is not so limited. It is a right which, under the act, belongs to the owner, and no oath is required in order to its exercise. It is a right to be exercised under the act as a law for raising revenue. · It is expressly distinguished from the privilege of redemption after sale and complete divestiture of title, which is accorded upon very different principles, and in pursuance of a very different policy. We cannot doubt that it might be properly exercised by the owner in person, or through any other person willing to act in his behalf and not disavowed by him.

The application of these principles decides the case before us. The title and possession of the land, at the time of assessment, was in B. W. Hunter for life, with remainder in fee to his son, the defendant in error. The life estate terminated, and the fee became vested in 1864. The sum due the United States for taxes, penalty, and costs, was tendered to the commissioners before sale, and it was their duty to accept it. The tender was not objected to as insufficient, but was refused solely because not made by the owner in person. This refusal not being warranted by the act, the tender must be held good. The certificate of sale under which the plaintiff in error claims title cannot, therefore, be sustained. The sale must be regarded in law as having been made after the payment of the tax, and as insufficient to vest the title to the land in the purchaser.

It follows that the judgment of the Court of Appeals of Virginia must be

AFFIRMED.