### UNITED STATES of America, Plaintiff-Appellee,

v.

### STATE OF MISSISSIPPI et al. (Smith County School District), Defendants-Appellants,

### Sylvarena Baptist Academy, Defendant-Appellant.

### No. 72–2521.

United States Court of Appeals, Fifth Circuit.

Aug. 23, 1974.

---

Heber Ladner, Jr., Sp. Asst. Atty. Gen., A. F. Summer, Atty. Gen. of Miss., Jackson, Miss., for the State of Miss.

Marvin Oates, Bay Springs, Miss., M. M. Roberts, Hattiesburg, Miss., for Sylvarena Baptist Academy.

L. D. Pittman, Raleigh, Miss., for School Bd.

Robert E. Hauberg, U. S. Atty., Jackson, Miss., Daniel F. Rinzel, Richard H. Swan, Andrew J. Ruzicho, Civil Rights Div., Thomas M. Keeling, Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, RONEY and GEE, Circuit Judges.

GEWIN, Circuit Judge:

The Smith County, Mississippi Board of Supervisors (hereinafter the "Supervisors") leased an unused public school facility to the Sylvarena Civic Center Association (hereinafter the "Association"). Thereafter, the Association subleased the facility to the Sylvarena Baptist Academy (hereinafter the "Academy"), a private segregated school, to house its students and teachers. In response to these developments, the United States Department of Justice filed a complaint seeking to have the sublease executed by the Association to the Academy set aside because it alleged that the sublease impeded the effectiveness of the district court's order mandating the desegregation of the Smith County schools. The district court set aside the original lease between the Supervisors and the Association basing the relief granted on the finding that the sublease between the Association and the Academy "chilled" the court's attempts to provide for meaningful integration of Smith County schools. On appeal, a panel of this court, while recognizing that impermissible state involvement had resulted from the leasing arrangements, determined that the relief granted by the district court was inappropriate. The panel opinion provided that the Academy should be enjoined from denying admission to any student on the basis of race. *See* 476 F.2d 941 (5th Cir. 1973). Subsequently this case was placed en banc. Since we conclude that the relief required by the panel opinion does not adequately address the precise issues involved as disclosed by the record, that opinion is vacated and this case is remanded to the district court with directions.

## I

On this appeal we are required to ascertain the appropriate equitable relief which a district court should grant as a result of its determination that a local government entity, which is currently under a directive to desegregate its school facilities, is impermissibly involved through a leasing agreement with a private segregated academy established to afford an educational haven for those white students seeking an escape from the newly integrated public school system. Our previous pronouncements concerning state involvement with private segregated schools demonstrate that covert efforts by local government officials to circumvent the effectiveness of school desegregation decrees through the leasing or the sale of public school property to "white flight" academies will not be sanctioned. Those who seek to continue or re-establish the previously discarded segregated order through private means are prohibited from receiving government largesse in their endeavors. Local government units that are under court mandates to operate unitary school systems have an emphatic duty and responsibility to assure that their relationships or undertakings with private parties in no respect encourage, aid, facilitate, or result in the establishment or operation of private segregated schools. With these recognized and guiding principles enunciated, it is abundantly clear to us that the district court acted within its sound discretion in recognizing that the leasing arrangement between the Academy, a private segregated school, and the Association must be cancelled.[1]

## II

In 1967, the Smith County School District (hereinafter "the school district") determined that it was economically infeasible to continue operating several of its rural schools, including the Sylvarena School.[2] Therefore, it ordered the Sylvarena School closed and its students transferred to the nearby town of Raleigh. Since the Sylvarena School was located on "sixteenth section land", the building reverted back to the control of the Supervisors.[3] The Supervisors, acting as trustees, must lease sixteenth section lands for the exclusive benefit of *public* education. In furtherance of their fiduciary duties, on March 4, 1968 the Supervisors entered into a lease agreement with the Association for the rental of the Sylvarena School. The Association was composed of white persons who lived in the Sylvarena area.[4] The Superintendent of the school district, Mr. Tally, approved the lease arrangement. The lease provided for a term of twenty-five years with an annual rental of five dollars. It was apparently the original intent of the Association to use the Sylvarena School exclusively as a village meetinghouse for public and social events and other community activities.

Throughout the summer of 1970, the residents of Smith County and neighboring Jasper County were confronted with the reality of the imminent desegrega-

---

1. We delayed our decision in this case pending the *decision of the Supreme Court in Gilmore v. Montgomery,* 417 U.S. 556, 94 S. Ct. 2416, 41 L.Ed.2d 304 (1974) which involved issues similar to the one here presented.

2. The Sylvarena School was composed of three buildings. It was located in the eastern portion of Smith County about half way between Raleigh (Smith County) and Bay Springs (Jasper County). Similar to many rural schools, it had experienced a dwindling enrollment. The closing related in no way to desegregation but resulted from economic expediency.

3. In Mississippi, the sixteenth section of each township has been set aside in perpetuity for the benefit of the public schools and title is vested in the state. *See* Miss.Const. art. 8, § 211. With some exceptions, the state legislature has vested control of such land in the local board of supervisors. Miss.Code § 29-3-1 (1973).

4. Mr. Cooper Duckworth, President of the Association, testified that membership in the Association was limited to residents of the Sylvarena community and former students of the Sylvarena School. Although he denied that blacks were excluded from the Association, he did admit that there were no black members.

tion *in fact* of their public schools. During July, several meetings were held by those residents who were interested in creating a private school in response to public school desegregation. After these initial organizational conferences, members of the private school movement conferred with officials of the Association for the purpose of discovering whether the Association would be interested in leasing the Sylvarena School buildings as a site for the future private academy. Following some tentative negotiations, an informal arrangement was consummated between the two groups whereby the academy leaders could take immediate possession of the school grounds and commence the necessary repairs on the deteriorated school buildings for occupancy in the fall of the year. The private school forces incorporated under Mississippi law naming their pedagogic venture the Sylvarena Baptist Academy.

With unusual zeal the members of the Academy donated their time and labors for the needed repairs of the school buildings. The issuance of membership shares furnished the initial capital outlay that was needed to purchase those materials that were not donated by civic-minded citizens in the area. As a consequence of the concerted community effort, the Academy was able to open its doors for the 1970 fall semester. The Academy and the Association then entered into a formal written agreement on January 15, 1971, leasing the property to the Academy for a term of twenty-two years, the period of time which remained under the Association's lease with the Supervisors. This sublease required an annual rental of five dollars to be paid directly by the Academy to the superintendent of schools.

Sylvarena's effective metamorphosis from a formerly public school to a private segregated academy did not go unnoticed. During the development stages of the private school, representatives of the United States Department of Justice repeatedly telephoned counsel for the school board and the Supervisors informing him that the Government felt that the lease violated the district court's previously issued desegregation order. However, these pleas for action fell on deaf and unresponsive ears. Thus on October 15, 1971, the Government petitioned the district court for supplemental relief pursuant to that court's retention of jurisdiction in its August 11, 1970 order requiring the immediate desegregation of the Smith County School System. The Government requested that the court cancel the lease between the Association and the Academy claiming that the lease interfered with the court's previous desegregation order in that white students from Smith County schools had enrolled in the all-white academy thereby undermining the effectiveness of its desegregation order.

On May 3, 1972, the district court made findings of fact and conclusions of law in which it canceled the lease between the Supervisors and the Association.[5] The court emphasized that under Mississippi law sixteenth section lands or the proceeds arising from their rental are to be utilized for the exclusive benefit of the public schools in Mississippi. Finding that the lease was executed to the Association in good faith by the Supervisors, the court nevertheless held that once the superintendent of the school board commenced receiving rental payments from the Academy, he, the school board and the Supervisors were under an affirmative duty to insure that the sublessee did not use the school buildings in a manner which would have a "chilling effect" on the operation of the recently desegregated public schools. In effect, the court found that the local government of Smith County through the Supervisors' lease to the Association had facilitated, encouraged and effectuated the establishment of the Academy. More impor-

5. The Supervisors, the Academy and the Association were made parties defendant on March 22, 1972 by order of the district court pursuant to the motion by the United States filed on October 15, 1971.

tant, the court concluded that the sublease interfered with its desegregation orders and the integration of the Smith, Jasper, Newton and Covington County School Systems.[6]

A review of the record demonstrates that the facts found by the district court are amply supported by substantial evidence. It is evident that at the time the Supervisors leased the property to the Association, no one was aware that the school buildings eventually would be occupied by a private segregated academy. However, the same conclusion can not be drawn with respect to the sublease from the Association to the Academy. At the time the sublease was executed both the Association and the Academy realized that the buildings would be used to house an all-white student body.[7] Many residents of Smith and Jasper counties were extremely upset over the prospect of their children attending integrated public schools. Private schools were being established at a very rapid pace during the summer of 1970 in Mississippi.[8]

It is beyond peradventure that both the Association and the Academy initiated their relationship with the intent of ensuring a white alternative to desegregated public education. Since its founding the Academy has been operated for white students only. Various Academy officials attempted to deny at trial that it discriminated against blacks. The facts show, however, that the student body is all white; the teaching staff is all white; and, the Academy plays *only* other all-white academies in sports. Thus, the Academy has effectively achieved its goal.

On appeal, a panel of this court, while recognizing that the Supervisors had become impermissibly entwined with the activities of the Academy, nevertheless deemed it necessary to modify the relief which had been ordered by the district court.[9] The panel vacated the district court's order setting aside the lease between the Association and the Supervisors and remanded with directions to require the Academy to admit students without regard to their race. We granted rehearing en banc to determine whether the panel had followed correctly our previous precedents in this increasingly litigated area of state involvement with private segregated academies.

6. The enrollment figures of the Academy for the four-county area included: Smith County—48; Jasper County—234; Newton County—4; Covington County—3.

7. Mr. Norman H. Hendry, President of the Academy, testified that the desegregation order was one of the chief inducing factors which resulted in the establishment of the Academy. Government counsel questioned Mr. Hendry on whether "the private academy is a segregated private academy at the present time[.]" Hendry responded, "That is right." Further Government counsel quizzed, "Did they know it was going to be an all-white academy?" Hendry replied, "An all-white—no. Probably yes." Although Cooper Duckworth denied that the Association had acquired the property for the purpose of establishing a private school, he did admit that at the time his group leased the premises to the Academy, he was aware that it would be used as a private school.

8. In Norwood v. Harrison, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973), Chief Justice Burger noted the dramatic rise in the number of private all-white schools in Mississippi. He observed:

> Private schools in Mississippi have experienced a marked growth in recent years. As recently as the 1963–1964 school year, there were only 17 private schools . . .; the total enrollment was 2,362 students. 916 students in these nonpublic schools were Negro, and 192 of these were enrolled in special schools for retarded, orphaned, or abandoned children. *By September of 1970, the number of private non-Catholic schools had increased to 155 with a student population estimated at 42,000, virtually all white.* Appellees [various Mississippi officials] do not challenge the statement which is fully documented in appellants' brief, that "the creation and enlargement of these [private] academies occurred simultaneously with major events in the desegregation of public schools. . . ." (Emphasis added; footnotes omitted). 413 U.S. at 457, 93 S.Ct. at 2806, 37 L.Ed.2d at 727.

9. *See* 476 F.2d 941 (5th Cir. 1973).

## III

Analysis of the proper relief which should be granted by a district court where it has been demonstrated that the state has become inextricably connected with private segregated educational institutions must begin with Wright v. City of Brighton, Alabama, 441 F.2d 447 (5th Cir. 1971). *Brighton* concerned the sale of an abandoned school building by the city of Brighton to the Hoover Academy, a private, all-white school. In July of 1969, Hoover officials approached the city government with an offer to lease the unused building. In response to the Academy's proposal, the Brighton city council authorized the mayor to lease the school to Hoover for two years with an option to purchase at the end of the lease period.

Wright immediately filed a complaint in the district court seeking to have the lease set aside. At a preliminary hearing before the district court, the presiding judge intimated that a lease of the school to the private Academy would violate well-settled principles proscribing state involvement with private segregation. Attempting to prevent the taint that would adhere to the proposed leasing arrangement, the city agreed to sell the school to Hoover. Following the sale, the district court approved the transaction finding no constitutional infirmities.

On appeal, this court reversed and remanded to the district court with directions to set the sale aside. The court first noted that Jefferson County, the county in which Brighton is located, was going through the long and laborious task of desegregating its school system. The record established that the city fathers were fully aware of the use to which the school building would be put. In fact, the sale had only been effectuated after the district court had informed the parties that a leasing arrangement would be impermissible. The sale had the effect of facilitating and encouraging the establishment of a private segregated academy. It placed special burdens on the black residents of Brighton who were denied access to the facilities of the private school. Accordingly, the court determined that the proper remedy in such a situation was to set aside the property transfer.

In McNeal v. Tate County School District, 460 F.2d 568 (5th Cir. 1972), the court was again confronted with the task of devising appropriate relief where a state sells public school property which ultimately becomes the situs for a private segregated school. In *Tate* the local school board advertised for bids for the sale of an unused school that was closed for purely educational and economic reasons. Harold Steward, who was acting secretly on behalf of a private academy, submitted the highest bid and accordingly the school property was transferred to him. The record demonstrated that the board had no notice that the school property would be employed for housing a segregated academy. Moreover, the district court had found that the private Academy would not interfere with its attempts to desegregate the local school system. Originally, a majority of the *Tate* court set aside the sale of the school property to the Academy. Upon rehearing, the original opinion was modified with directions requiring the private Academy to admit all applicants based on merit and without regard to race. 460 F.2d 574 (5th Cir. 1972). In *Tate* the district court found as facts that the school authorities acted in good faith and according to law in selling the property and that the consideration paid therefor was not inadequate. The sale was public after proper advertisement and none of the plaintiffs objected to the sale. Moreover, the purchasers were not brought into the litigation initially and with the apparent knowledge of the plaintiffs expended substantial sums of money at a time when the plaintiffs could have objected to the sale but did not do so. More important, the district court found that the sale *did not* interfere with any integration decree. In *Tate* we adhered to our holding in *Wright*.

■■ Although the remedies granted in the two cases are different, the following principles may be distilled from *Tate* and *Brighton* and account in part for the varying results. First, both cases recognize that a state cannot provide a means for the establishment, facilitation, encouragement or continuation of a private segregated school. Second, the nature of the relief granted in *Tate* does differ from that accorded in *Brighton*. The divergent results are attributable to the unique equities presented by each case. Two factors, good faith on behalf of the school board in selling the property and the fact that the sale did not affect any desegregation orders, provided a basis in *Tate* for merely requiring the private school to admit all applicants without regard to race instead of the more severe *Brighton* remedy of mandating that the sale be set aside. In sum, if a state actually sells property knowing that the property will be used for the establishment of a segregated academy or the sale actually interferes with the desegregation of the public school system then the sale must be set aside.

With these fundamental principles delineated, we are firm in our belief that the district court should have set aside the lease between the Association and the Academy. The three-party arrangement revealed here involved on-going state aid which facilitated, encouraged and resulted in the establishment and continuation of a private segregated academy. The facts demonstrate that the Association, a recipient of generous public largesse through the use of public facilities for nominal rental, had sublet public property with the knowledge that it would be used to house a private segregated academy within the recently desegregated public school system.

Furthermore the state retained a reversionary interest in the leased premises. At least since 1890, Mississippi has held sixteenth section property in perpetuity for the *benefit of public school education. See* n. 3 *supra.* It would be a perversion of that laudatory goal to permit the lease of public school property for nominal rental to an institution which practices the exclusion of blacks. Moreover, unlike a sale which is final and can be made in good faith, a lease involves an on-going relationship and the intimate involvement between all the parties concerned with the leasing arrangement. Here, the Academy paid a nominal rent of five dollars to the superintendent of the school board. Appellee placed the local government officials on notice that their actions had resulted in substantial aid to the Academy but the officials failed to take appropriate action to insure that the effect of the district court's previous desegregation order would not be vitiated by their subsequent relations with private parties.

■ Thus, this is not a *Tate* case where the state sold property in good faith and retained no interest whatsoever in the property. Furthermore, as indicated earlier the district court in *Tate* found that the sale did not interfere with its desegregation orders. Here, in contrast, the district court determined that the leasing arrangement would have a "chilling effect" on its attempts to provide for a desegregated public education system. Wide latitude must be granted to a district court in its attempts to provide appropriate remedial relief in a school desegregation suit.

The result we reach here is buttressed by the recent decision in Norwood v. Harrison, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973), reversing 340 F. Supp. 1003 (N.D.Miss.1972) (three-judge court). In that decision the Supreme Court provided guidance on both the quality of state interaction with private academies which contravenes the proscriptions of the equal protection clause and concomitantly the proper relief which should be accorded by a district court once it determines that this impermissible state involvement exists. In *Norwood*, black students attending public schools in Mississippi challenged the state's program of providing free textbooks to children attending allegedly pri-

vate segregated schools within the state. Mississippi had provided free textbooks to all students since 1942, long before the state was under an affirmative duty to dismantle its dual school system. Moreover, it was apparent that the free textbook system was devised not to facilitate or support the establishment of private segregated academies but to improve the general educational quality dispensed within the state to all students regardless of the school attended.

The black plaintiffs, recognizing the right of students to attend private schools, limited the compass of their challenge to the state's supplementation of free textbooks to white-flight academies which had been recently organized to thwart the effectiveness of the school boards' responsibility to immediately desegregate the public schools.[10] A three-judge court denied the plaintiffs relief holding that the textbook program did not violate or interfere with the state's duty to desegregate since the textbooks were provided to the children and not the particular private schools which the children attended. Relying in part on the Supreme Court opinions distinguishing aid to parochial schools from aid to individual students, the district court held that aid to the latter was constitutionally permissible regardless of the student composition of the private school that was attended. The lower court placed decisive emphasis on the fact that plaintiffs had failed to demonstrate that the free textbook program had encouraged or facilitated white flight from the public schools. Plaintiffs' failure to establish that white students would not have left the public schools even without the aid of free textbooks was given controlling weight. Finally, the three-judge tribunal noted that the textbook program had not prevented the desegregation of the public schools in Mississippi since over 90% of

the students remained in the presumptively desegregated schools.

On appeal, a unanimous Supreme Court rejected the lower court's reliance on the establishment clause and concluded that whether the particular program of governmental aid or involvement under scrutiny actually prompted the exodus of white students to private academies was legally irrelevant.[11] Chief Justice Burger found no distinction between granting free textbooks to discriminatory private academies and free tuition grants since both "are a form of financial assistance inuring to the benefit of the private schools themselves."[12] Both types of assistance furnished significant forms of support to the discriminatory academies. Furthermore, the Chief Justice distinguished textbooks from other general services bestowed by a state such as police and fire protection since textbooks may be readily acquired from private sources. The opinion clearly states that in deciding whether a particular government service violates a state's duty to refrain from becoming involved with private discrimination, the court must look to the nature of the aid under scrutiny.

■■■ The Court accepted the district court's conclusion that the plaintiffs had failed to demonstrate that free textbooks had encouraged white flight, but rejected the legal significance which the district court attached to plaintiffs' omission of proof. The Court stated succinctly that,

. . . the Constitution does not permit the State to aid discrimination even when there is no precise causal relationship between state financial aid to a private school and the continued well-being of that school. A State may not grant the type of tangible financial aid here involved if that aid has a significant tendency to facili-

---

10. It is interesting to note that the record in this case establishes that the Academy was receiving free textbooks from Mississippi at the time of the district court's opinion.

11. Mr. Justice Douglas and Mr. Justice Brennan concurred in the result without filing an opinion.

12. 413 U.S. at 466, 93 S.Ct. at 2810, 37 L. Ed.2d at 732.

tate, reinforce, and support private discrimination.[13]

Thus a court's examination should not be addressed to whether the state involvement actually encourages white students to flee the public school system but whether the aid, regardless of the proclivities of the individual participants in the private academies, "has a significant tendency to facilitate, reinforce, and support private discrimination."[14] Equal protection proscriptions are not limited to state aid that is the motivating force for white withdrawal from the public schools but more importantly restricts such aid to segregated academies even though the white students decision to attend the Academy is not influenced by the particular aid granted.

■ Although the Court was sympathetic to the state's laudatory goal of insuring quality education to all students regardless of the school they attended, it was firm in the conclusion that "good intentions" could not be erected as a barrier to an attack on a state's neutral system of aid which resulted in governmental involvement with private discrimination. Disagreeing with the legal significance ascribed by the state to the fact that the free textbook program had been established without regard to racial motives, Chief Justice Burger concluded:

> The Equal Protection Clause would be a sterile promise if state involvement in possible private activity could be shielded altogether from constitutional scrutiny simply because its ultimate end was not discrimination but some higher goal.[15]

Thus regardless of the state's initial motive for undertaking programs which involved nonracial goals, a court's inquiry should be directed to the actual result of the state activity and not the motivating reason for initiating the particular state involvement concerned. Mississippi had established a presumptively neutral program for dispensing textbooks in 1942. Subsequent events in the private school movement within the state changed this neutral program to active state involvement with pervasive private discrimination. Once again the Court demonstrated the importance of looking to the result of a state's largesse.

■ Conjointly, the Court dismissed the legal significance derived from the fact that Mississippi now operates a unitary school system. It concluded that the Mississippi textbook system was infirm because it aided in the continuation of private school discrimination. A state does not discharge its constitutional responsibilities by simply eradicating the dual school system but it must likewise make certain that it does not aid in the "organization and continuation of a separate system of private schools."[16] Therefore, the state's duty to disengage itself from the private "school system" is a continuing one and the achievement of a unitary public system does not diminish the state's responsibility in any manner.

Finally, the Court rejected the district court's reliance on the establishment clause cases, and remanded the case with directions to require the Mississippi officials to refuse to grant free textbooks to children attending private schools which are *in fact* not integrated.[17]

13. *Id.*, 413 U.S. at 466, 93 S.Ct. at 2811, 37 L.Ed.2d at 732.

14. *Id.*

15. *Id.*

16. *Id.*, 413 U.S. at 467, 93 S.Ct. at 2812, 37 L.Ed.2d at 733.

17. Mississippi contends that the Court's remand recognized that a school with a boiler plate clause which states that it admits all without regard to race is enough and thus

there must be no showing that a school is in fact integrated. Our reading of the Court's remand, however, leads us to conclude that it was caused by the unique posture of the case. Plaintiffs had attacked state aid to all white private schools in a blanket attempt to have all schools enjoined. The Court recognized that some schools may not in fact be discriminating on the basis of race. The Court stated in its remand that the private schools should "among other factors, affirmatively declare its admission policies and

The same factors which contributed to the Supreme Court's determination that the Mississippi textbook program was infirm are substantially present in this case. First, both the textbook program and the initial leasing agreement now under review originated from a neutral, nonracial basis and goal. While the textbook program was admittedly instituted to insure a minimum of quality education, the Supervisors in the instant case pursuant to Mississippi law leased an abandoned school building to the Association without any overtones of racial discrimination. Second, both these ongoing state ventures culminated in an illicit union of the state with segregated education through subsequent changes in the educational complexion which emanated from the tremendous groundswell in Mississippi to establish private academies. In neither situation did the state intend the ultimate result but in both it must nevertheless be held in part accountable for the resulting objectionable consequences.[18] Third, the United States in this case like its *Norwood* counter-

parts, confines its challenge to the state's involvement with private segregated education and does not seek to have blacks admitted to the Academy. In both instances the challenge is directed toward the character of the state's connection with the private recipient and does not seek to address the validity vel non of the recipient's admission policies. Therefore the relief ordered must be fashioned with a consideration of the issue in focus. As the Supreme Court in *Norwood* required state disengagement, not affirmations of nondiscriminatory admission's standards, so must we. Fourth, in *Norwood* the Court required elimination of the state's largesse even though there had been no showing of a causal connection between the governmental aid and white flight and the necessary interference with school desegregation which would flow from such a finding. Here in contrast, there has been a showing of both encouragement and an interference with the district court's attempts to insure desegregated education in the school districts con-

practices, *state the number of its racially and religiously identifiable minority students* and such other relevant data as is consistent with this opinion." *Id.* 413 U.S. at 471, 93 S.Ct. at 2813, 37 L.Ed.2d at 735. (emphasis added) Thus the Court required more than a simple statement that a particular school did not discriminate but additionally an affirmative statement showing the number of minority students actually in attendance. *See, e. g.* Cook v. Hudson, 365 F.Supp. 855 (N.D.Miss.1973). Although we intimate no judgment on the actual holding in *Cook*, Judge Keady's opinion indicates that the litmus test for receiving free textbooks in Mississippi after the *Norwood* opinion is actual integration in private schools. *Id.* at 857. Similarly, we have consistently rejected a private schools' incantations that it does not discriminate simply because it has adopted a nondiscriminatory statement as to admissions. *See* Wright v. City of Brighton, Alabama, 441 F.2d 447, 449 (5th Cir. 1971); Gilmore v. City of Montgomery, 473 F.2d 832 (5th Cir. 1973), cert. granted 414 U.S. 907, 94 S.Ct. 215, 38 L.Ed.2d 145 (1973), affirmed in part and remanded with directions for further proceedings, 417 U.S. 556, 94 S. Ct. 2416, 41 L.Ed.2d 304 (1974); Graham v. Evangeline Parish School Board, 484 F.2d 649 (5th Cir. 1973).

18. Similarly in other cases, the Supreme Court has rejected a school board's attempts to isolate its conduct from constitutional attack on the ground that the program under challenge was initiated for *non-racial reasons.* In Wright v. Council of City of Emporia, 407 U.S. 451, 462, 92 S.Ct. 2196, 2203, 33 L.Ed.2d 51, 61 (1972), the Court placed in proper perspective the importance to be attached to the *purpose which prompted the institution of a particular activity or program* when it is revealed that the program had an undesirable impact on a district court's attempts to achieve a unitary school system. Justice Stewart observed for the Court that:

. . . [The Court has] focused upon the *effect—not* the purpose or motivation—of a school board's action in determining whether it is a permissible method of dismantling a dual [school] system. *The existence of a permissible purpose cannot sustain an action that has an impermissible effect.* (Emphasis added)

Thus, regardless of the motives which prompt the initiation of a particular activity, *judicial scrutiny must be directed toward the consequences of the school board's actions.*

cerned. Hence the present facts present more compelling reasons for requiring state disinvolvement than were present in *Norwood*. Finally, textbooks like buildings are not the type of generalized services that are provided by a state. Such services are a far cry from police and fire protection which are provided to all regardless of the character of the recipients.

Our conclusions are further buttressed by the Supreme Court's opinion in Gilmore v. Montgomery, 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974). In *Gilmore*, black residents of Montgomery, Alabama filed an action for supplemental relief to the district court's order requiring integration of the city park facilities and its mandate requiring integration of the Montgomery schools asserting that the city's policy of permitting private segregated schools and clubs to utilize the park facilities violated the court's previous orders. In resolving a problem similar to the one in the instant case, the district court held that the city could not constitutionally permit the private segregated schools to exclusively use the park facilities as a place for school sporting events because as a consequence of the arrangement:

> Montgomery [provided] aid to private, segregated schools, thus encouraging and facilitating their establishment and operation as an alternative for white students who in most instances are seeking to avoid desegregated public schools. In addition, Montgomery's school board and all other city governmental officials are under an affirmative duty to desegregate.

337 F.Supp. 22, 24 (M.D.Ala.1972). The district court found that the effect of the city's aid was substantial because it saved the private school large amounts of money which would have to be expended in capital outlays for sports facilities and additionally provided revenue from ticket sales to the private school sporting events which could be used to increase the size of the private schools' coffers.

This court affirmed the relevant part of the district court's holding. Judge Clark writing for the court stated:

> Because of the court's prior mandate to Montgomery to eliminate racial discrimination in education, and in light of the capacity of all-white private schools to frustrate this goal, any state involvement with such schools is subject to special scrutiny. It is well established that federal courts may enjoin any state assistance to private school organizations which serves to "impede, thwart or frustrate the execution of the integration plan mandated against [a public school district]."

473 F.2d 832, 835 (5th Cir. 1973) (citations omitted). As in this case, Montgomery's actions had aided the private schools and could not be judicially countenanced. The Supreme Court granted certiorari and reaffirmed the legal conclusions reached by this court with respect to the exclusive use of the park facilities by private schools for fund generating sporting events. See 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304. The Court held:

> Particularly important is the fact that the city's policies operated directly to contravene an outstanding school desegregation order. See Carr v. Montgomery County Board of Education, 232 F.Supp. 705 (M.D.Ala.1964); 253 F.Supp. 306 (M.D.Ala.1966); 289 F.Supp. 647 (M.D.Ala.1968), aff'd as modified, 400 F.2d 1, 402 F.2d 782, 784, 787 (CA5 1968), reversed and remanded sub nom. United States v. Montgomery County Board of Education, with directions to affirm the judgment of the District Court, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969). Certainly, the city's officials were aware of this order and were responsible for seeing that no actions on their part would significantly impede the progress of school desegregation in the city. Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L. Ed.2d 5 (1958); Green v. County School Board of New Kent County, 391 U.S. [430] at 437–438, 88 S.Ct.

[1689], at 1693–1694, 20 L.Ed.2d 716; Alexander v. Holmes County Board of Education, 396 U.S. 19, 20, 90 S.Ct. 29, 30, 24 L.Ed.2d 19 (1969). Any arrangement, implemented by state officials at any level, which significantly tends to perpetuate a dual school system, in whatever manner is constitutionally impermissible. "[T]he constitutional rights of children not to be discriminated against . . . can neither be nullified openly and directly by state legislators or state executive or judicial officers, nor nullified indirectly by them through evasive schemes for segregation whether attempted 'ingeniously or ingenuously.'" Cooper v. Aaron, 358 U.S., at 17, 78 S.Ct., at 1409. This means that any tangible state assistance, outside the generalized services government might provide to private segregated schools in common with other schools, and with all citizens, is constitutionally prohibited if it has "a significant tendency to facilitate, reinforce, and support private discrimination." Norwood v. Harrison, 413 U.S. 455, 466, 93 S.Ct. 2804, 2811, 37 L.Ed.2d 723 (1973).

The constitutional obligation of the State "requires it to steer clear not only of operating the old dual system of racially segregated schools, but also of giving significant aid to institutions that practice racial or other invidious discrimination." Id., at 467, 93 S.Ct., at 2812.

417 U.S. 556, 568, 94 S.Ct. 2416, 2423, 41 L.Ed.2d 304 (1974) (footnotes omitted). Since Smith County like Montgomery has become impermissibly entangled with private segregation, disentanglement is the only sound remedy which will adequately address the problem presented.

Thus Norwood and Gilmore and our previous holding in Brighton provide a basis for setting aside the lease between the Association and the Academy. All the facts found by the district court were supported fully by the record. Nevertheless, we do not feel that the facts found support the legal conclusion that the lease between the Supervisors and the Association must be cancelled. In our opinion that lease is not subject to the infirmities found by the district court. The sublease between the Association and the Academy is the arrangement which can not be approved and must be set aside.

Initially the United States did not seek a cancellation of the lease between the Supervisors and Association. At the hearing conducted below, the court suggested this possibility and Government counsel agreed that such remedial action would be consistent with the Government's position.

It is significant that the district court found that the Supervisors had leased the unused school buildings to the Association in good faith without any knowledge that it would subsequently be used to house a private segregated school. The Government's challenge was limited to the use of the property by the Academy and not the Association. Giving full consideration to the record evidence and the facts found by the district court, it is clear to us that the only constitutional infirmity which was established related to the subsequent lease agreement between the Association and the Academy. The Government has never challenged the right of the Association to use the leased premises or the use actually made of the property by the Association. Accordingly, it is apparent to us that the district court should have set aside the sublease and should not have interfered with the lease between the Supervisors and the Association.[19]

19. We intimate no view of the constitutional validity of the lease between the Association and the Supervisors under the decision in Gilmore and similar state action cases. In the instant case, that was not the issue tried in the district court. Counsel for the Department of Justice informed the court that, "We have no objection to the Civic Center Association having a lease and using the former public school building as long as they

## IV

■ Where proscribed state involvement is found to exist with private segregated academies, appropriate relief must be accorded black persons to remove "root and branch" the government's aid in whatever form it manifests itself. Relief should be designed in response to the issues placed into focus. The ultimate goal of an equitable decree in such situations, is to make those private enterprises dedicated to segregated schools, private *in fact* as well as in name. In this case, the panel opinion merely required the Academy to make a "boiler plate" promise that it would not discriminate in its admission policies. In the cultural and economic milieu of Smith County, this relief is patently insufficient.

Under the facts and circumstances disclosed by the record it is difficult to conclude that a mere declaration by the Academy that it will accept minority applicants would result in any appreciable change in the racial composition of the Academy's student body, especially in view of current admission charges. Moreover, even assuming economic independence, the Academy's obvious policy of segregation which infects its scholastic and sports programs would very likely chill the ambition of any black child who might entertain a desire to attend classes there.

This cause is remanded to the district court with directions to modify its order setting aside the lease between the Supervisors and the Association and to order that the sublease between the Association and the Academy be voided. In all other respects, the district court's order is affirmed.

Affirmed in part, reversed in part and remanded with directions.

COLEMAN, Circuit Judge, with whom DYER and SIMPSON, Circuit Judges, join, concurring in part and dissenting in part.

I was a member of the panel which rendered the original opinion in this case, United States v. State of Mississippi, 5 Cir., 1973, 476 F.2d 941. I therefore avail myself of the privilege of commenting on the *en banc* opinion now about to be handed down.

Since it is in accord with the original panel opinion, I heartily concur in that part of the *en banc* opinion which *reverses* the cancellation of the original lease from the Smith County Board of Supervisors to the Sylvarena Civic Center.

Only the cancellation of the lease from the Sylvarena Civic Center to the Sylvarena Academy remains for discussion.

Our Brother Gewin is to be highly complimented for an unusually lucid analysis of the underlying facts and of prior court decisions. It is to be regretted, however, that such a splendid exposition fails to recognize the one decisive feature of the case: the Court is now directing the cancellation of a lease between *private parties*—a lease in which no officer or agency of the State or County had any power, authority, or participation. No state action was involved. I cannot square this with the Fourteenth Amendment.

It is no answer to say that the Sylvarena Civic Center (and Academy) lands are held in trust for the benefit of the school children of that township.

As to the paramount title, this undoubtedly is true, Jones v. Madison County, 72 Miss. 777, 18 So. 87 (1895). Nevertheless, the same constitutional prohibition of the sale of such lands further provides that they may be leased for a specified term of years and for a

---

don't sub-lease it to a private segregated school. We object to that. We don't have any objection to their leasing the property or using the property." Whether a properly

prosecuted case which focused on the lease to the Association could present cognizable constitutional deprivations is not before us.

gross sum, the proceeds to be covered into the public school funds, Mississippi Constitution of 1890, § 211.

On March 4, 1968, three years and eight days prior to our decision in Wright v. City of Brighton, 441 F.2d 447, the Board of Supervisors, in good faith, leased the former Sylvarena school property to the Sylvarena Civic Center Association for the statutory term of twenty-five years. Thereafter, for that period of time, no county or state official had, or could exercise, any power, authority, dominion, or control over the use of the land, any more than if it had been similarly leased to a private individual for any imaginable purpose whatever. There could be nothing sinister about the nominal rental charge on this small acreage, occupied by an abandoned school building of severely limited utility. Moreover, when it came to granting a lease, the Board was entitled to take into consideration the fact that, like all other Mississippi rural schools in existence prior to 1953, the residents of the community had been taxed for the construction of the building in the first place. No state or county funds could have gone into the construction of the building. To be more specific, the Board of Supervisors simply legalized, in a formal manner, use by community citizens of a building which they had already paid for at the tax collector's window. Additionally, it is not disputed that the Academy spent $25,000 in labor and materials for the rehabilitation and improvement of the old school house.

What the *en banc* Court is doing, in the exercise of a purportedly Fourteenth Amendment power, is to cancel (forfeit) a lease from one group of private individuals to another.

This reminds us of some other language appearing in Gilmore v. City of Montgomery, *supra*:

The Equal Protection Clause of the Fourteenth Amendment does not prohibit the "[i]ndividual invasion of individual rights." Civil Rights Cases, 109 U.S. 3, 11, 3 S.Ct. 18, 21, 27 L.Ed. 835 (1883). It does proscribe, however, state action "of every kind" that operates to deny any citizen the equal protection of the laws. *Ibid.* This proscription on state action applies *de facto* as well as *de jure* because "[c]onduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action." Evans v. Newton, 382 U.S. 296, 299, 86 S.Ct. 486, 488, 15 L.Ed.2d 373 (1966). In the present case we must determine whether the city of Montgomery engaged in discriminatory activity violative of the parks desegregation order. We must also decide whether the city's involvement in the alleged discriminatory activity of segregated private schools and other private groups, through its providing recreational facilities, constitutes "state action" subject to constitutional limitation.

It also brings to the fore another statement appearing in that opinion:

"The District Court does not have carte blanche authority to administer city facilities simply because there is past or present discrimination. The usual prudential tenets limiting the exercise of judicial power must be observed in this case as in any other." [Footnote 10].

If this be true as to publicly owned facilities, it is equally true, if not more so, as to facilities legally belonging to a private group for a specified term of years.

Neither do I understand Norwood v. Harrison, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723, to require the forfeiture of this private property right. *Norwood* held that private schools have the right to exist and operate. The State of Mississippi was not ordered to discontinue supplying books to private schools. Private schools were simply required to submit for approval a certification procedure, affirmatively declaring constitu-

tionally acceptable admission policies and practices, and supplying other relevant data.

The Sylvarena Academy is being required to *forfeit* its vested rights in real property, together with the fruits of labor and money expended on that property, amounting to $25,000. This Court met and decided that issue on another field in McNeal v. Tate, 5 Cir., 1971, 460 F.2d 568. There a divided panel, Judge Gewin dissenting, invalidated a sale of former public school property in Tate County, Mississippi, and directed that the property be reconveyed to the Tate County Board of Education. This was nothing less than a forfeiture because there was no lawful authority by which Tate County could have voluntarily or involuntarily refunded the purchase price or pay for the improvements made by the private owners. The ultimate outcome was that on petition for rehearing the sale was upheld but the operation of a private school on a discriminatory basis was enjoined. The specific language, 460 F.2d at 574, was that the injunction should:

" . . . provide that if the Thyatira School property is used for a private school, such school shall be operated without any discrimination of any kind or character based upon race, creed, color or national origin, and the doors of any such school shall be open at all times to all qualified applicants on an equal basis."

When the panel decided the instant appeal, it applied the remedy directed by *McNeal, supra.* It makes no difference that *McNeal* involved a good faith sale to a private individual, who later sold it to the private school group. That is what happened here. There was a good faith lease to a private association, which leased it to the private school.

Other than imprisonment itself, forfeiture of real property rights is the most highly penal of all possible remedies, Bennett v. Hunter, 76 U.S. 326, 9 Wall. 326, 19 L.Ed. 672 (1869); forfeitures are not favored and a court of equity is always reluctant in the last de-

gree to order one, Union National Bank v. Matthews, 98 U.S. 621, 25 L.Ed. 188 (1878); indeed, a forfeiture may be enforced only when within both letter and spirit of the law, United States v. Automobile Financing, 307 U.S. 219, 59 S.Ct. 861, 83 L.Ed. 1249. A forfeiture proceeding is quasi-criminal in character and can only be directed toward penalizing someone for the commission of an offense against the law, One 1958 Plymouth Sedan v. Com. of Pa., 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170.

It is not against the law to operate a private school; it is a right protected by law, Norwood v. Harrison, *supra.* This Court cannot enjoin the operation of the Sylvarena Academy as a lawfully operated private school, so it simply orders it to forfeit its school building, which produces at that location the same result, plus the loss of property rights.

Even if this school were publicly owned or operated and thus within the Fourteenth Amendment, the remedy, applied literally hundreds of times, is not to forfeit the property but to require that it be operated in a constitutional manner. Even if we are to brush aside the private status of this school and shove it across the Fourteenth Amendment gap, that is the remedy which should be applied in this case, as was done in McNeal v. Tate, *supra,* and as was done by the Supreme Court in Norwood v. Harrison, *supra.*

Although the Sylvarena Academy has not surrendered its lease, and the case is not legally moot, we were informed at oral argument, not disputed, that after the panel decision directing the constitutional use of the Sylvarena property, the site was abandoned and the private school moved to another location. Thus, the Court is now using a dead school as the vehicle for holding that it has Fourteenth Amendment authority to obliterate, by judicial decree, transactions between private parties. Further, that obliteration may be accomplished by commanding the forfeiture of property capable of being used in a perfectly constitutional manner. To this, my concep-

tion of constitutional rights will not allow me to assent.

I concur in that portion of the majority opinion which leaves undisturbed, as it had to do, the lease from the Board of Supervisors to the Sylvarena Civic Association.

I dissent to that part of the opinion which directs the forfeiture of the lease from the Association to the Academy.