**Billy D. COOK et al., Plaintiffs,**

v.

**Robert W. HUDSON et al., Defendants.**

**No. WC 73-65-K.**

United States District Court,
N. D. Mississippi, W. D.

Nov. 1, 1973.

John B. Farese, Ashland, Miss., for plaintiffs.

Will Hickman, Oxford, Miss., Paul M. Moore, Calhoun City, Miss., S. T. Rayburn, Sumners & Hickman, Oxford, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In this § 1983 case, the plaintiffs, Billy D. Cook, Loula Juanita Milton Adams and Mrs. W. P. Wright, formerly employed as teachers at the Calhoun City Attendance Center, sue the Board of Education of Calhoun County, Mississippi, the County Superintendent of Education and the school principal for reinstatement, back pay and other relief. Claiming that they were unconstitutionally discharged, plaintiffs invoke federal court jurisdiction under 28 U.S.C. § 1343(3). The cause was initially set for hearing on plaintiffs' motion for preliminary injunction; however, the parties consenting thereto, trial of the action on the merits was advanced and consolidated with the preliminary hearing. Following the presentation of evidence at two separate hearings and submissions of briefs by counsel, the case is now ripe for final decision.

Certain background facts provide the setting for the present controversy. On August 9, 1968, this court entered an order terminating the dual school system previously existing in the public schools of Calhoun County which had proved to be ineffective under freedom of choice and directed immediate desegregation. By the order in United States of America v. Calhoun County Board of Education, No. WC 6637, pupils in the first three grades were assigned to county schools in accordance with geographic zones for the 1968–69 school year; and pupils in grades 4, 5 and 6 were so assigned the next school year, 1969–70, coincident with the desegregation of the upper six grades subsequently ordered. Entering a standard *Singleton*-type decree with respect to faculty, staff, transportation and other services activities and facilities, the court enjoined the board to take affirmative steps to eliminate racial discrimination from the public schools and to bring about a unitary school system within the county.

At the time of the court order, no private school, either religious or secular, had ever existed in Calhoun County. Within one month thereafter, local citizens formed the Calhoun Educational Foundation Corporation, organized to establish and operate Calhoun Academy, a secular private school which from its beginning has been attended by an all-white student body and served by an all-white faculty and staff.

When first established, Calhoun Academy was located about six miles south of Calhoun City, and originally provided the first three grades for elementary

students who, except for desegregation, would have attended public school at Calhoun City. Subsequently, the school employed D. L. Harrison, former public school principal, as headmaster. The Academy has sinced moved to a new location north of Calhoun City; the school has added six more grades and enjoys significant support of certain citizens and local organizations, notably the local chapter of the Citizens Council, interested in maintaining a racially segregated education program. Calhoun Academy, because of its failure to adopt racially nondiscriminatory admission policies satisfactory to Internal Revenue Service, no longer has tax exempt status under § 501(c)(3) of the Internal Revenue Code,[1] nor has the school, though initially supplied with state-owned textbooks, qualified to continue receiving such textbooks pursuant to this court's order implementing the Supreme Court's decision in Norwood v. Harrison, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973). It is inescapably clear that Calhoun Academy is a racially discriminatory institution formed in the wake of public school desegregation to provide a haven for segregated education.

In November 1972 the school board, acting upon the recommendation of its attorney, the superintendent and other school officials, verbally adopted a policy which, though never reduced to writing, is agreed to provide as follows: "Prior to the employment of a new teacher, or the reemployment of an existing teacher, the children of any such teacher, if living in Calhoun City, Mississippi, would be required to attend the public schools of said Calhoun County, or said teachers would not be employed or reemployed." The evidence establishes that although stated in general terms, the policy was adopted only with Calhoun Academy in mind, as that institution still remained the only private school within a county where parochial or religious schools had never existed.

In November 1972, the children of 8 public school teachers were enrolled in the Academy; and its student body was wholly composed of white children residing in the county. Although informally adopted, the board's policy was nevertheless made known to the teaching staff without delay; it was freely discussed among the teachers who understood it would become effective at the beginning of the next school year. The board did not expressly provide that any teacher affected by its policy would be granted a hearing; and no teacher, including the plaintiffs, ever requested a hearing, or was refused one by the board.

When new teacher contracts were being made in April-May 1973, Roger W. Hudson,[2] principal of the Calhoun City Attendance Center, refused to recommend the plaintiffs for teaching positions on his faculty. The sole reason for refusal was that the plaintiffs, otherwise qualified to continue their teaching duties, stated that they could not comply with the board's policy, and concededly they have not done so. It is undisputed that plaintiffs were informed that the failure to comply with the board's policy would preclude their reemployment, but plaintiffs, unlike some other teachers in the system, elected not to comply and preferred to send, or continue sending, their children to Calhoun Academy. Each plaintiff testified at the hearing.

Billy D. Cook, a high school teacher with 5 years' experience in the Calhoun public schools, enrolled his two children, ages 7 and 5, in the private academy, in

1. Green v. Connally, 330 F.Supp. 1150 (D.C. D.C.1971, 3-judge), aff'd sub nom Coit v. Green, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed. 2d 550 (1971) ; and affidavit filed therein of Commissioner of Internal Revenue on September 30, 1970, revoking advanced assurance of deductibility as to 9 private schools, including Calhoun Academy ; Internal Revenue Bulletin No. 1971–12 dated March 22, 1971; letter dated July 3, 1973, from District Director of Internal Revenue to W. A. Matthews, Mississippi Text Book Purchasing Board.

2. Erroneously sued as Robert W. Hudson.

a belief that it provided "a calmer environment" for them and insured against his showing them "natural partiality of a parent" while attending public school. Ms. Adams, who had taught two years at the Calhoun City Attendance Center, enrolled her two small children in the private school, deeming them to be better off in "a calmer situation" where they would receive more individual attention and be exposed to daily devotions, including the reading of Bible stories. One of Ms. Adams' children had a speech defect or difficulty which she stated influenced her decision although a speech therapist was employed at the public school but not at the private academy. Ms. Adams, like Mr. Cook, was a Baptist and conceded that the Academy was a secular and not a religious school. Ms. Wright, a Methodist, had taught six years as a home economics teacher in the Calhoun County public schools. Her two children, ages 10 and 7, had attended the private school for several years when the board's policy was announced. Her reasons for so enrolling them were of a similar nature, as she preferred for her children the smaller class groupings and exposure to Bible studies and devotional exercises. Moreover, Ms. Wright found that the Academy was of greater convenience for her children to attend than the public school since it was within walking distance of the family residence. Ms. Wright had withdrawn her older child from the public school the first year of desegregation, had devoted considerable time to promoting the private school, and acknowledged that she was not totally committed to a desegregated public school system. Each plaintiff's testimony was, on cross-examination, substantially impeached as to the underlying cause for the decision to patronize the private school. The court concludes, as a fact, that the dominant, if not sole, reason why each plaintiff enrolled his or her children in Calhoun Academy was to avoid the desegregated public school system.

Plaintiffs challenge the constitutionality of the board's policy on several alternative grounds, which may be summarized as follows: (1) The policy violates First Amendment rights they have as parents to send their children to a school of their choice in the exercise of freedom of association and freedom of religion; (2) The policy, applicable on its face to all private schools of every description, is both impermissively broad and indiscriminate and also an unreasonable and arbitrary classification, thus offending the Equal Protection and Due Process Clauses of the Fourteenth Amendment; and (3) The policy further contravenes the procedural due process rights safeguarded by the Fourteenth Amendment since it failed to provide plaintiffs with a hearing before the school board and a reasonable opportunity to present their individual grounds for not complying with the blanket policy before being terminated as teachers in the public school system.

Defendants, denying the foregoing contentions, claim that plaintiffs have no viable First Amendment rights in expecting or seeking continued employment in the public schools of Calhoun County, that the board's policy, as applied to plaintiffs whose children attend a racially discriminatory private school, is a reasonable regulation by any standard of equal protection review, and finally, that plaintiffs, being non-tenured teachers without more than an expectancy of reemployment, had no due process rights to a hearing prior to not being offered new contracts of employment, or, if such right did exist, their claims in this regard are now properly before the court for determination after full hearing, and plaintiffs have failed to show substantial grounds for exemption under the board's policy.

While the board's policy may be novel and one not heretofore judicially ruled upon, we are of the opinion that the case is controlled by familiar principles of constitutional law and the policy should be upheld as applied to the facts of this particular case. No relief can be granted to the plaintiffs.

Plaintiffs rely, primarily, upon the constitutional right as parents to send their children to the school of their choice, in accordance with the First Amendment "freedom of association" right vouchsafed to them by Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L. Ed.2d 1488 (1958); and Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), and assert that under Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), they cannot be required to forfeit these First Amendment privacy rights as a condition of further public school employment. The Supreme Court cases upon which plaintiffs rely are, in our view, both factually and legally distinguishable and do not sustain them in the present factual setting. Conceding there must be clear justification for curtailing or limiting First Amendment rights, nevertheless, plaintiffs' rights as parents may not be considered in isolation, and to the exclusion of other constitutional demands of equal, if not greater, magnitude. "As no constitutional guaranty enjoys preference, so none should suffer subordination or deletion." Ullmann v. U. S., 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956). The instant case, at first blush, may appear to present a choice between competing values that might be urged under the First Amendment and what is done in fulfillment of the Fourteenth Amendment. As *Pickering* makes clear, courts must "arrive at a balance between the interest of a teacher, as a citizen [in the exercise of First Amendment rights], and the interest of the State as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568, 88 S. Ct. at 1734. Thus, First Amendment rights must be applied "in the light of the special characteristics of the environment of the particular case", Clark v. Holmes, 474 F.2d 928, 931 (7 Cir. 1972); Tinker v. Des Moines Independent School District, 393 U.S. 503, 89 S.

Ct. 733, 506, 21 L.Ed.2d 731 (1969); and where the exercise of First Amendment rights impairs the teacher's effectiveness, or conflicts with the performance of his job, the school board may lawfully refuse to rehire the teacher. Cf. Cole v. Choctaw County Board of Education, 471 F.2d 777 (5 Cir. 1973). The Supreme Court succinctly stated in Adler v. Board of Education, 342 U.S. 485, 492, 72 S.Ct. 380, 384, 96 L.Ed. 517, 524 (1952):

> "[Teachers] have no right to work for the State in the school system on their own terms. . . . They may work for the school system upon the reasonable terms laid down by the proper authorities. . . . If they do not choose to work on such terms, they are at liberty to retain their beliefs and associations and go elsewhere."

It necessarily follows that if the board's policy is a reasonable and constitutional regulation, plaintiffs may not complain of the consequence of not being rehired as public school teachers for having exercised their right to send their children to a private school.

The validity of the board's policy presents a more serious issue since it applies, literally, to all private schools of every description and regardless of particular circumstances that might motivate parental desire for private, and not public, schooling. Yet the undisputed proof shows that the school board, the plaintiffs and the local community understood that the regulation was adopted, and has been applied, only as to public school teachers who patronize the racially discriminatory private school at Calhoun City. We express no opinion as to whether the policy might validly extend to teachers sending their children to schools which do not foster racial discrimination but are specially designed for physically handicapped or mentally retarded children or offer other specialized training not in general competition with the public school system. Since private schools of that nature are not attended by plaintiffs' children, they cut

no figure in this case. We, therefore, construe the policy in the limited terms intended by the board and applied to the plaintiffs.

■■■ The board's policy passes muster under the Equal Protection Clause of the Fourteenth Amendment if it satisfies the rational relation standard, which is the test ordinarily applicable to cases that involve the non-reemployment or dismissal of public school teachers. Cole v. Choctaw County Board of Education, supra; Fisher v. Snyder, 476 F.2d 375 (8 Cir. 1973); McEnteggart v. Cataldo, 451 F.2d 1109 (1 Cir. 1971), cert. denied, 408 U.S. 943, 92 S.Ct. 2878, 33 L.Ed.2d 767 (1972); Drown v. Portsmouth School District, 451 F.2d 1106 (1 Cir. 1971). By this standard, a regulation is invalid as a denial of equal protection of the law only if it is without some reasonable basis and is palpably arbitrary; the regulation will be upheld so long as a state of facts reasonably can be conceived to support it. In our view, the board had ample justification to adopt its rule.

According to the weight of the evidence, the board was persuaded that the challenged rule was needed to eliminate racial discrimination from the public schools. Public school desegregation in Calhoun County was a controversial policy which caused a division in the community; many citizens immediately threw their support to continuing racial segregation in a private school to operate in competition with the public schools. Since white flight may present a serious obstacle to effective desegregation, a school board is empowered to adopt appropriate measures in aid of the schools under its charge. Defendants, without dispute, acted with no purpose or motive other than to strengthen local support for the public schools by requiring its teachers to give their undivided loyalty to the unitary school system and forego allegiance as patrons of schools practicing racial discrimination. A requirement of this kind, instead of being arbitrary and irrational, is based upon logic that is readily discernible. Defendants' experts in the field of educational psychology expressed the view, which we accept, that the challenged policy was significantly related to a teacher's effectiveness and job performance: students in desegregated classes are likely to perceive rejection, and experience a sense of inferiority, from a teacher whose own children attend a nearby racially segregated school, and be inclined to perform at a lower educational level. Indeed, the Supreme Court itself has documented a finding that: "A sense of inferiority affects the motivation of a child to learn." Brown v. Board of Education, 347 U.S. 483, 494, 74 S.Ct. 686, 691, 98 L.Ed. 873, 880. Moreover, the Supreme Court, in *Norwood,* spoke of racially discriminatory private schools in these words:

"Under Brown v. Board of Education, supra, discriminatory treatment exerts a pervasive influence on the entire educational process. The private school that closes its doors to defined groups of students on the basis of constitutionally suspect criteria manifests, by its own actions, that its educational processes are based on private belief that segregation is desirable in education." 93 S.Ct. 2812, 37 L.Ed. 2d 733.

Thus, an adequate factual basis exists for concluding that public school teachers who send their own children to a segregated school manifest a belief that segregation is desirable in education and a distrust in desegregated schools. Actions speak louder than words, to students no less than to adults. We hold that the board's policy, where limited to racially discriminatory private schools, is a permissible regulation, adopted in keeping with the command of the Fourteenth Amendment and the desegregation order of this court to eliminate racial discrimination and remove its pervasive influence from the county's public schools.

■■■ Finally, we consider plaintiffs' claim that the board's failure to provide them with a hearing prior to termination violated their procedural due proc-

ess rights. Mississippi, of course, does not have a tenure system for public school teachers, and plaintiffs have failed to show the existence of any rules or understandings with defendants whereby they would be continued in employment beyond the period of their teaching contracts. Plaintiffs held one-year contracts which expired at the end of the 1972–73 school year; they were not discharged during the school year. Although all of the plaintiffs had been employed in the Calhoun County school system for several preceding years, none had more than a "subjective expectancy" of reemployment generated by prior periods of employment. Under these circumstances, it is settled law that a hearing was not necessary. Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Skidmore v. Shamrock Independent School District, 464 F.2d 605 (5 Cir. 1972); Moore v. Knowles, 466 F.2d 531 (5 Cir. 1972). In *Skidmore*, the court upheld the nonretention, without a board hearing or statement of reasons, of a teacher who had been employed for twenty-two consecutive one-year terms. In a Mississippi case, Thompson v. Madison County Board of Education, 476 F.2d 676, 679, the Fifth Circuit emphasized that at the *end* of a school year, a school board "can refuse to rehire a non-tenured teacher with no expectation of reemployment without any reason at all." In the instant case, however, plaintiffs were plainly advised of the reason for their nonretention and had every opportunity to seek a hearing before the board if they desired one. Indeed, the burden was incumbent upon them to initiate review proceedings, and to demonstrate that the board's failure to rehire was a violation of constitutionally protected interests. *Skidmore*, supra.

Assuming, however, that plaintiffs were entitled to a due process hearing, they have been accorded a full hearing in this court, and they have had opportunity to present evidence in support of their claims. In the light of the facts heretofore found, the court holds that the board's failure to rehire the plaintiff was a lawful act and did not constitute a violation of any constitutional rights held by plaintiffs.

Let an order dismissing the complaint with prejudice be entered.